Case No. 15-5162, City of Duluth Appellant v. Natl. Indian Gaming Commission and Jonadav Oseola Chahari at his official capacity as Chairman of the Natl. Indian Gaming Commission. Ms. Luderman for the Appellant, Ms. Runtree for the Appellate. Ms. Runtree for the Appellate. Good morning. I'm M. Allison Luderman. I represent the City of Duluth. May it please the Court. This is a unique dispute. It arises from a legacy of an innovative development initiative between the City of Duluth and the Fond du Lac Band of Lake Superior Chippewa that I will be referring to as the band in these proceedings. This initiative predated the Indian Gaming Regulatory Act, the Act, and was originally conceived in the early 1980s, formalized through a series of 1986 agreements, as amended now by the 1994 agreements, which were approved by the Indian Gaming Commission, the Commission, in 1994. We are now before this Court as a result of the Commission's violation notice issued by it in 2011. So the violation notice in 2011 represents the second time that the Commission has weighed in on the validity of the 1994 agreements. Duluth is challenging the Commission's action here, and the issues in this case include whether the Act granted the Commission the authority to reopen its 1994 approval and to reverse that earlier decision. Also whether the Commission abused its discretion by concluding that local revenue-sharing agreements with gaming tribes and local governments, a revenue-sharing expressly authorized by the Act, has to be limited to term-limited fee-for-service agreements, which is not a requirement of the statutory language. And whether the Commission abused its discretion by applying its new standard retroactively to these 1994 agreements, which the Commission previously approved. Typically, we're not too concerned about... I mean, adjudications are always retroactive. We're concerned about them if there was a detrimental reliance. What's the detrimental reliance here by the City that... As I can tell you, you spent all your money on this before 1994. I think it's important to understand how the matter ended up at the Commission in the first place in order to understand the City's detrimental reliance. I understand that. We've read the briefs. But I didn't understand what the detrimental reliance is. What's the money that you spent that you wouldn't otherwise have spent? Detrimental reliance doesn't just mean the money we spent. So we'll take money off the table. There's no money spent. We did spend money. What's the money that you spent in reliance and detrimental reliance? On the 1994 decision? Yes, yes. The City, what it did is it canceled the guarantees for the bonds that were issued so that the City issued to develop and build the municipal parking ramp. The band and the Commission had guaranteed that the bonds would get paid off. The City canceled those guarantees as part of the 1994 agreements and became solely responsible for those bonds. Secondly, the City became responsible for the maintenance of the parking ramp, which had previously been the responsibility of the Commission that prior to 1994 was managing the casino. But the City owns the ramp, no? So it would ordinarily be responsible for its maintenance? Yes, but in the 1986 agreements it leased the parking ramp to the Commission and the Commission became responsible for the maintenance of the parking ramp. And that was another financial detriment to the City at that time. The City, in reliance and receipt of those proceeds, had issued various bonds for road construction, which it was relying on this revenue stream for repayment. These were the financial risks that the City took when it agreed to the 1994 agreements. Was the road construction related to casino traffic or just general road construction? Just general road construction. What the City did is in its charter it created a community investment fund and the casino proceeds were placed into those funds. And the City, which is notorious for its bad roads, could probably win the blue ribbon for bad roads, began a process of systematically going through its road inventory and trying to get things fixed up. Bracketing for a moment the potential detrimental reliance, going back to your first claim, it seems to me that a notice of violation is within the prerogative of the Commission to look at this anew and say, our legal view was wrong and we think, at least going forward, that it must be changed. And I'm not sure that I see much of an argument on your part against that authority. I think the answer to your question brings up the issue of the fact that its approval in 1994 was a final agency action under Section 2714 of the Act. Do you take that to mean that they could never change their mind again, final in that way, as in set in stone, not bound from the top of Sinai, and not going to change? That brings up the concept of inherent authority, which the Commission argued is... So the answer to that is yes, that's your understanding of final authority, that when it's talking about final authority there it means they can never change their mind. They can change their mind under two circumstances. If the statute itself provides for a process for changing the mind, and then secondly, if it isn't provided in the statute, which it isn't here, then there is the common law concept, the agency concept of inherent authority. But inherent authority is not forever. Under the Ivey case, which we cited in our brief, the circuit does recognize that inherent authority has to be exercised within a reasonable amount of time. I believe it was the Coeur d'Alene case that we cited that also discussed... How do you respond to the government's argument that the use of the word final agency action here is just in terms of judicial review? That's the standard language we use, that Congress uses, to determine what type of action is subject to judicial review under the APA. My response to that is, when Congress wanted to give the Commission the ability to have retroactive authority, it did so expressly. For example, in Section 2711 under management agreements, it expressly provided for an ability to go back and re-review management agreements. With regards to agreements that predated the IGRA... And in the absence of such expressed language, they can't go back? Not under statutory authority. They have to rely on their inherent authority, and they have to rely on the limits of that inherent authority. But in IV sports, the reasonable time precedents that this Court relied on were about an adjudication of one thing, not about an ongoing regime over time. So the notion that you were or were not going to approve a medical device, and if somebody wanted to reverse that, they had to do it within a reasonable time. Here we're talking about whether the relationship between these two parties going forward for decades is one that's lawful. And when the Commission decides in its view it's not, it claims authority to come forward with a notice of violation. So that seems quite distinct from the situations in which the reasonable time limitation applies. This situation is quite distinct than from anything that the Commission cited in their briefing. In fact, they have cited no case where, in the absence of congressional enactment or regulatory change, the agency reopened the prior adjudication that was of 16-year precedent and re-reviewed it wholly based upon not new regulation and not new statute. I reserved a minute, so I just wanted to double-check my time there. They have cited to no case that has done that, and nor have they demonstrated that under this new concept of term-limited fee-for-service modeling, they have reopened any other ordinance approval where there was a local sharing government between the gaming tribe and a local entity that wasn't for fee-for-service. Nor have they cited to anything in the statute where Congress limited local government sharing agreements to fee-for-service models. You say that the NOV limits the parties to limited duration fee-for-service contracts, but this seems quite different from that. As I understand the facts, the band owned the land and was nonetheless paying rent to the city on the land. I find it hard to understand how the parties even got there in the first place. First off, the city didn't have any reservation land in the city of Duluth. Their established reservation was immediately adjacent to the city of Cloquet, which is about 23 miles southwest of the city of Duluth. They had a bingo parlor down there. They came to the city in the early 80s and said, we'd like to have a bingo parlor in the city of Duluth because Duluth is a tourist attraction. It's a place where people come to go on vacation, and they thought that they could have a more financially viable casino there, and the city agreed. The first thing that they had to do was figure out how to create a reservation in the city of Duluth. The city was a partner with them in utilizing its political influence to do what it could. The band found the old Sears building, which was on a corner of Superior Street and 2nd Avenue West in the city of Duluth. That Sears had closed down. They purchased the land, and then the agreements were negotiated. The band applied for trust status, which the city did not understand under 465, and then petitioned for it to be made part of the reservation, which the city encouraged it to do so that it then could have a location where gaming would happen. As part of this development agreement, they also created a commission agreement, and it was this commission that was going to be a political subdivision of the band, but which was made up of membership appointed by the city and the band that was going to be operating this casino. Because the ideal back then, this was a development initiative, and I realize it's unique. It's shocking. Indian tribes and local governments trying to work together.  But it wasn't just about the casino. They thought there might be other opportunities, synergistic opportunities, where the two governmental entities could get together and work together through this commission. So that's how the band ended up owning the casino building. They rented it to the commission, who was running the casino, and even in the NOV, the commission concedes that that 86 agreement was a management agreement. And so the commission had a lease from the band, and as part of the negotiations in 1994, the parties determined that what they would do then was just have the commission sublease the property back to the band, and then the rent monies that were being received, they assigned to the city. There's no notes from when the parties were working with the commission back in 1993 and 1994 on this, all the intricacies of what was talked about in order to come up with, conceivably, as a convoluted 1994 arrangement. But that's kind of the basic history of it. Maybe you could just summarize for us what the benefits were that you thought the city was giving after the casino was set up and running, that it gave in exchange for the $75 million that the band paid. Well, first, I don't think that the assumption in your question is correct, that the city, in order to have local sharing arrangement, that there's some kind of quid pro quo there, because Congress didn't mandate that. All it said was that gaming tribes could share the revenues for local government operations. It didn't say that those revenues had to be in some relationship to the services provided by the city, which is very unlike what they did with management agreements under 2711. And as we all know, when Congress sets up different processes for different things, we're supposed to take attention to that. Well, to follow up on that, though, if I think, if I understood you correctly, you said the 86 Agreement, where the commission was managing the casino, was a management agreement. It was. But you also said that this was intended to be revenue sharing, which is permitted under IGRA. The 86 Agreement predated the Act. They weren't created with the Act in mind. So they were one of those agreements that predated the Act that under 2712, Congress told the commission to review. And if the agreements didn't comply with the Act, it gives the parties time to work it out. So in 94, this was changed. That's right. And you received the commission's blessing for the changes that you made. That's correct. Assuming that what you thought of as a management agreement went away at that point. That's absolutely correct. But can I ask, having encouraged this trust land in the city of Duluth, you had created essentially Indian country. Can the city of Duluth get any tax revenue from this? No. No. Okay. So effectively, the money that was being paid, I mean, one way of looking at that is that that is revenue sharing, which otherwise, whatever is provided by the city of Duluth to any business, they would not be paying into the tax base for that. They don't pay for property taxes. They don't pay for city sales tax. They don't pay into the city's beverage tax. Well, I just thought when you were talking about detrimental reliance, you talked about canceling the bond guarantees and so forth, but you didn't talk about services that the city would otherwise be providing apparently gratis, right? That happened, we gave that up in 1986 when the lands went into trust. Because they're trust lands. As part of the 86 agreements, we and the city got to participate in the revenue sharing from the operation. And in the 94 agreements, then we canceled the guarantees and took on the sole responsibility for the maintenance of the parking ramp. So but now under the commission's notice of violation, or at least the way that the band responded to that notice of violation, you get nothing, right? Not only do we get nothing, but they were able to convince the Minnesota courts to relieve them of any responsibilities under the contract and the consent decree. And some of those responsibilities included their agreement to comply with city zoning laws, building code laws, fire enforcement laws. It was a mutual aid agreement in the sense that it authorized the city police department to have law enforcement powers on the reservation, which otherwise it doesn't have, which is under public law 280. All right, so if crimes occur in the casino, you have no law enforcement. We have a problem. Duluth has no law enforcement authority. Yeah, we have a jurisdictional problem there right now. The county obviously has jurisdiction because of public law 280, but the city of Duluth technically does not. That's still something that's being worked out. That's just one of the things that we have to deal with now because the agreements don't exist anymore, and that's a problem. I have a minute of time reserved at the end. Thank you. Thank you. May it please the court, Tamara Rountree for the National Indian Gaming Commission. I think I'll start with counsel's statement that the city is getting nothing in this discussion of what the city did and didn't get. Perhaps I should begin with the fact that this phrase revenue sharing does not apply to this case. Revenue sharing has particular meaning under this statute, and it does not apply here. What we're dealing with is a particular provision, which is 2710 B2B Roman 5, which says that the revenue from gaming activities can be used to help fund operations of local governments. That's not revenue sharing, which applies to a different category of agreements. So what we have here is a provision that allows for the funds to be used to help fund local governments, but the important point that counsel has not recognized is that under IGRA, there are certain broader requirements that this funding provision is subject to, one of which is that tribes are to have the sole proprietary interest in gaming activity. Another is Congress's intent, which is expressly stated in the statute, that gaming is to be protected as a means of generating revenue for the tribe. And the third is that the tribe is to be the primary beneficiary of the gaming activity. What we have in this case is that over, as Judge Bellard noted, over a roughly 15-year period, what the city got was $75 million. What the city got was approximately $5 million a year. What the city hasn't established is that it didn't undertake any risk associated with that money. It didn't provide any commensurate services, as far as we have in the record, that account for $5 million a year. The city did get something, and it's not clear that they provided any services to the tribe that was commensurate with the amount of money that they received. What about the argument that it was part of the deal to compensate for the lost tax revenues? The city understood the circumstance when they allowed for there to be Indian country in Duluth. It's not meant to be a quid pro quo where we'll allow you to be here, and you've got to give us millions of dollars a year. There's nothing in the record to support that. Well, she pretty candidly admits that they didn't really fully understand what they were getting into and thought that it was permissible to have a kind of joint venture and that it was set up that way before IGRA and before, you know, which doesn't mean that it's lawful under IGRA. Indeed. So one of the questions is, why is this in violation of the tribe's sole proprietary interest? I mean, you can have sole proprietary interest in something and be very generous with the benefits that flow, and you say, well, it's supposed to be primarily for the benefit of the Indians, but I think the majority of the funds were retained by the Indians. So if they wanted, if the band, in full cognizance of its rights, wanted to pay the city just under half of the revenue stream on an ongoing basis for things like roads and fire protection and urban development and, you know, just thought it was in its interest to be a real Duluth bootster, would that be in violation of IGRA? If perhaps it were articulated that there were this kind of fee for service specific articulation of what the money was for, but here we just have the band agreed to something, not realizing perhaps what it would ultimately result in, but also there's the importance of sole proprietary interest, sole, not shared. And as you've suggested, if you didn't say exactly, this did start out as a joint venture, which under IGRA is not permissible. If any flavor of that remains in the agreement post-IGRA, that's a problem, and that's what the NOB recognized. That's what decisions after, for example, the 1994 letter written by Chairman Hope, decisions by, not decisions, general counsel opinions, final enforcement actions coming from the commission, realize that when you have long-term agreements that the tribe is bound, or tribes are bound by, when you have agreements in which there's a high level of compensation going to the non-tribal party, and there's no, as I said, for example, here, there's no assumption of risk associated with the compensation, or where you have an element of control by the non-tribal party, which also was here, that is a problem under the statute. Ms. Rundry, what about Ms. Litterman's argument that inherent authority to reverse the agency's position would have to be exercised within a reasonable time of its original decision? If I may, to be clear, the government has not argued that the issue here is one of inherent authority, and I ask the court to please just be careful in assuming or adopting the language used by the city. The government never used the phrase inherent authority, and that is not the argument we're making. The argument we're making is, as Judge Griffith has suggested, there is a general rule recognized by this court and the Supreme Court that agencies may revisit past interpretations of the statute. Thank goodness. Indeed, yes. And they may revisit their prior decisions, and courts have recognized you don't want agencies to remain stagnant with a decision simply because they made it in the past. They can revisit. They can correct. The theory that the city has come up with now is that the commission is arguing that it has the inherent authority to reopen a decision and to change that decision, and the city has relied on cases like Ivy Sports in which the agency sought to reopen a decision or to rescind a decision for the purpose of correcting a mistake or providing a remedy for an error. That is not what happened here, and that's not what we're arguing. What did happen here? What happened here? What changed between 94 and now? In terms of? Well, it's the same statute, right? I mean, that's what the chairman, Hope, was looking at, and, you know, as far as I know, the statute is not any different. Are you saying what happened here from the lines of the commission? It was sort of 180. On the one hand, the commission said we could look at this because there's a problem with sole proprietorship and you need to fix these agreements, and they went back, entered into a settlement where they presumably tried to fix the agreement, and the chair of the commission said, yes, that's satisfactory. You fixed the agreement, and 16 years later, the same commission says, no, that wasn't fixed. Two immediate points come to mind. The first is please be cognizant of the fact that Chairman Hope issued his decision when the commission was very young and had not been faced with this issue before, and clearly looking at the letter, which is all of 2 1⁄2 pages long, there's no detailed analysis in there of the statute or of their agreements or of the impact of the agreements on potential impacts on the tribe. What we have subsequent is years of knowledge gained by the commission, which brings us back to why agencies are able to revisit past decisions. They learn from their decisions. It sounds as though Your Honor in some way wants to chastise the agency for not. No, I'm not taking any position at all. I'm just asking what was different. And I'm just suggesting that there was a wealth of knowledge that was gained by the commission as time went on, as indicated in the subsequent opinions. And as the NOV explains, the three basic elements of time, compensation, and control, because the city also had a significant element of control. It had veto power over the tribe's ability to make amendments to its gaming ordinances or to its regulations. This clearly flies in the face of what IGRA. Could you speak to the detrimental reliance argument? Indeed. I'm actually quite upset with you for allowing counsel to discuss an issue that was waived because it wasn't addressed in their opening brief. And the only thing they say in their reply brief as to detrimental reliance is that they, in response to the ban's 1989 litigation, that the city gave up defenses and that it ultimately agreed to a settlement, a settlement that resulted the 1994 agreements and a settlement which resulted in $75 million to the city. So number one, it's the government's position that they waived that argument. To be honest with you, if Your Honors intend to use any of what was discussed in terms of the city's claims of detrimental reliance, I actually request that we be able to provide supplemental briefing because we weren't able to address any of what was said here today before the court. I actually, let's see, as to one more point, the question of jurisdiction, the city's jurisdiction over the, for example, criminal activities within the casino, this too was something that wasn't briefed. But under public law 280, it's my understanding that as the state's relationship with the tribe, that there is jurisdiction to tend to matters, criminal matters within the casino. And it seems as though I believe I heard counsel say that the county could also, also has jurisdiction. So I'm not, as I understand it, and there's nothing before this court, there isn't a problem with jurisdiction. Well, and presumably the tribe could enter into an intergovernmental agreement with the city, allowing the city to come in. I suppose that's the case, but I suppose they haven't because, as I said, I understand that the state, there is jurisdiction for criminal matters to be tended to. I do have one further question, which is I'm assuming that if a state negotiates a compact, a gaming compact with a tribe, that they could include within that compact some requirement for some payment, since they would not be able to tax those entities in a way. A state, we're speaking of a state now. A state, exactly. So I guess my question is, are cities or municipalities precluded from doing something like that? I apologize, I can't speak to that. I'm quite certain that Ingrid doesn't speak directly to it. But in this case, there was no, that sort of arrangement wasn't there. It's simply that the city would be paid a certain percentage of the tribal revenue, and the city, as I said, didn't assume a risk in doing so and has not articulated. Clearly, it would be easy enough to say, okay, yes, we got $5 million a year, and this is what we provided the tribe with that amounted to roughly $5 million. And what's important also is the money that was received by the city went into a general fund, which could be spent anywhere. So in terms of what the city provided to the tribe is – Well, see, there's an argument going on here, the subtext of which is there has to be a correlation or a sort of quid pro quo for what is being paid. But ordinarily, and I understand that you're making a different argument, but ordinarily businesses that are within a city might be paying taxes, and they might feel like, you know, there isn't a quid pro quo, right? Their money is going into the general fund, and it just takes care of fire and police and all those different kinds of things. Because this is trust land, the tribe would not have to do that, right? And so I'm not sure. I mean, I know the commission makes that argument that somehow this has to sort of – you know, you should total it up on both sides, and they should have some relationship one to the other. And that makes sense if you were talking about a management agreement. But if you aren't talking about that, what is the argument for saying that it has to be fee for services, essentially? The argument is not that it has to be. The argument is that what the tribe – has to be one that is consistent with and comports with the goals and the intent of IGRA. And at the end of the day, there is – there's nothing that says there has to be a balance. At the end of the day is that this act is in place to protect the tribes. And when it begins to look like the city is benefiting to an extent that it is actually detracting from what the tribe should get, then there is a problem here. And as I said, it's not only a question of money. We have to look at the entire picture. We have to look at, as I said, the control that the city had. We have to look at the veto power. We have to look at – Well, but in the past, what happened was the commission said there's a problem here. You're doing something which isn't permitted under IGRA. And so you need to fix that. So, for instance, in this circumstance, it might have been possible for them to go back and say, well, you can't have veto power over our gaming ordinance, right? You have to take that out of the agreement. And that could have been done. But that wasn't what happened here. You're saying the ban could have gone back to the city? Well, I'm not – no, I'm not saying that. Obviously, the ban did not wish to go back to the city. The ban was delighted to get that notice of violation because it was a way for them to get out of the contract. But I'm just saying that the use of the notice of violation in that way wasn't something that had to be done in that way, correct? I'm so sorry. I'm not following you. Well, in other words, they could have done what they did the first time they were told there was a problem with their agreement, which was to fix it. They being the parties? The parties, exactly. Oh, indeed. The parties at any time could go back and renegotiate something that was in keeping with IGRA as articulated by the views of the commission in current day. And may yet do so. I'm sorry? And may yet do so. Indeed, yes. To prevail. What is it that entitles the 2011 NOV to deference? What makes it a document with the force of law? Is that entitled to Chevron treatment? Yes, because the sole proprietary interest and responsibility provision has no articulation in the statute as to what's required, what's not required. This is all something that the commission has to grapple with and feel its way through. Does the NOV result from a formal adjudication, or what's the process, or how do we understand that beast, the NOV, as a matter of administrative law? Well, it's an action that the commission can take when it finds a violation of the statute. And the way that worked here is that the ban came to the commission in 2010. It was after the ban began to withhold rent because it realized that, and one of the stated reasons for withholding the rent is that the city had asserted something akin to proprietary interest in the casino, and the ban said you don't have an assertible proprietary interest in the casino. So for several reasons, including that, when the ban withheld rent, the city sued. During that process, it sued for breach of contract. During that process, the ban went to the commission and said, would you reexamine these 1994 agreements? Bear in mind, under IGRA, the ban is the entity responsible for ensuring that all agreements that govern the operation of the casino are consistent with IGRA. And if they are not, the ban could be subject to fines. The casino could be subject to closure. So when it went to the commission, and the commission is the authority, the regulatory agency that enforces the provisions of IGRA, the point was to establish that for the ban's sake and in keeping with the requirements of the statute, that the provisions of the agreement were in accord with the statute. Would the commission have done that sui santi? I mean, the commission had already ruled on those 1994 agreements. What process would cause them to look at it again if the ban didn't go to the commission? I can't speak to that with certainty. I'm just going to guess that the commission has a lot on its plate and can't just start plucking through past decisions and saying, you know what, let's take a peek at this one and see what the current status is. As I said, in this case, the ban came to the commission, and the commission fulfilled its statutory duty to review the agreements to see if there was a statutory violation. Unless this court has any further questions, the judgment of the district court should be affirmed. Thank you. Ms. Laruman, I know you had no time left, but we'll give you back one minute. Thank you. The commission suggests that, well, you know, after we issued the violation, the parties could have gotten together and renegotiated the agreement. But, in fact, we could not do that because that's not what the commission allowed the parties to do. The commission in its interview expressly said that the ban must cease performance under the 1994 agreements. One of those provisions identified in this NOV is violating the IGRA. This applies to the entire 42-year term of the 1994 agreements, which means ban the first-term payments that were due and owing by the end of 2010 and you haven't paid yet and which the city got summary judgment on a breach of contract claim. You don't have to pay those anymore. You better not pay them. If you pay them, you might be in violation. The term of the agreement, too long. This agreement can't keep going on because we just told you the term was too long. And, you know, if they had said, you know, we don't like this idea that the city can say no to your change in ordinance, fine. We'll fix that. But they didn't give us a chance to fix us. They ordered the ban to cease performance under these agreements. So the question becomes, then, under basic tenant of administrative law, whether regulated parties have been treated fairly. And it's the city's position in this case that it has not been treated fairly. Reversing the NOV is not going to harm the interests of the ban. They are the primary beneficiary of the gaming activity. No one has ever said that they aren't. Even the commission in the NOV did not claim that they were not the primary beneficiary. No one has claimed that anyone has tried to control how they run their gaming. There's nothing in the evidence suggesting that the city of Duluth has ever interfered with the way they've operated their gaming activity. They remain the primary beneficiary. They were the sole proprietor after 1994 and continue to be so. The policy in the IGRA of establishing federal standards is enhanced if the commission provides clearly articulated standards that are consistently applied because that best serves the interests of the gaming tribes and local governments. People know what the rules are. People can put together agreements that follow the rules. If you go to the commission and say, does this agreement comply? And the commission says yes, that establishes good relationships between tribal governments and local governments. That encourages the kind of cooperation that the city and the band here were engaging in early on. You see, clear standards that consistently apply inform and support decision-making. They encourage cooperation. They enhance the governmental interests of the gaming tribes and the local communities. They bring stability to the system, and they best enhance the rule of law. We request that the decision of the court be reversed and that the NOV be reversed. Thank you for your consideration. Thank you.
judges: Brown, Griffith, Pillard